# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Estate of James Ryan McNeil, by and through Stephanie Berkes, as Successor in Interest; Stephanie Berkes, individually; John McNeil, individually; and Sharell McNeil, individually,

                                                Plaintiffs,

v.

Freestylemx.com, Inc., a California Corporation; Mark Burnett, an individual; Boost Mobile, LLC, a Delaware Corporation; Sprint/United Management Company, a Kansas Corporation; and Does 1 through 50, inclusive,

                                                Defendants.

Case No.:  13cv2703 NLS (KSC)

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**[Dkt. No. 70]**

1

This diversity case involves wrongful death claims brought by the estate, wife and parents of James (Jim) McNeil.  Jim McNeil suffered serious injuries in a failed practice jump on November 6, 2011, in anticipation of a freestyle motocross exhibition at the Texas Motor Speedway. Defendants FreestyleMX.com ("FreestyleMX") and its owner, Marc Burnett, organized and set up the event.  Jim McNeil subsequently died from his injuries.

Plaintiffs Estate of James Ryan McNeil, Stephanie Berkes, John McNeil and Sharell McNeil filed a Second Amended Complaint ("SAC") alleging  (1) negligence and gross negligence (by all Plaintiffs); (2) loss of consortium (by Stephanie Berkes); and (3) wrongful death (by Stephanie Berkes, John McNeil and Sharell McNeil). Dkt. No. 46. They also allege Defendants acted recklessly and with malice in conscious disregard of Jim McNeil's safety, entitling them to punitive damages.

The parties consented to magistrate judge jurisdiction.  In January 2015, this court heard Defendants' first summary judgment motion, where they argued that Jim McNeil freely and knowingly executed a Waiver and Release that relieved Defendants of any and all liability for any injury Jim McNeil suffered.  This court denied Defendants' motion because it found a question of fact as to whether Jim McNeil signed the Waiver and Release.  It also found that even if valid, the Waiver and Release would not release a gross negligence claim under California law, the substantive law that applies in this case.

Now, Defendants seek summary judgment on liability, arguing that under the primary assumption of risk doctrine Defendants owed no legal duty to protect Jim McNeil from catastrophic injury and death, as those are inherent risks in the sport of freestyle motocross.  They also argue there is no evidence of intentional or malicious conduct on their part to support a claim for punitive damages, so they should receive summary adjudication as to that issue.  Plaintiffs counter that the secondary assumption of risk doctrine (also known as comparative fault) applies here rather than primary assumption of the risk.  Even if the court finds that primary assumption of risk applies, they argue Defendants failed to meet their burden on summary judgment.  Plaintiffs also

argue that assessment of punitive damages is a question of fact to be decided by a jury.

The court held an oral hearing on this motion.  For the following reasons, the court **DENIES** Defendants' motion for summary judgment.

## I.   BACKGROUND FACTS[1]

### A. Jim McNeil.

Jim McNeil was a professional motocross rider and jumper who had participated in such events throughout the world since 2000.  Separate State of Uncontroverted Facts (SSUF) ¶ 2.  He began riding motorcycles at the age of five.  SSUF ¶ 21.  His father recalled taking McNeil out "every morning" to practice riding dirt bikes.  SSUF ¶ 22.

McNeil's interest in motorcycles continued after high school, where he worked as a motorcycle mechanic and developed a friendship with professional rider John Distler.  SSUF ¶ 23.  During these years McNeil practiced tricks jumping on ramps and used foam pits for landing.  SSUF ¶ 24.  McNeil turned professional in 2000.  SSUF ¶ 25.

McNeil quickly rose to the top of the freestyle motocross ranks, and began competing at the X-Games in 2005.  SSUF ¶ 25.  He had a reputation for being one of the best riders in the industry, and was known to have one of the "cleanest" motorcycles in the sport due to his background as a motorcycle mechanic.[2]  SSUF ¶ 27.  McNeil died on November 6, 2011 while attempting a motorcycle jump at a Boost Mobile-FreestyleMX freestyle motocross exhibition at the Texas Motor Speedway in Fort Worth, Texas.  SSUF ¶ 1.

### B. The Incident.

The Freestyle Motocross Exhibition took place from November 4 to 6, 2011, at the AAA Texas 500 NASCAR Event at Texas Motor Speedway.  SSUF ¶ 9.  Only riders hired by FreestyleMX were allowed to participate.  SSUF ¶ 10.  McNeil provided his

---

[1] These facts are uncontested, unless otherwise noted.

[2] In other words, as a mechanic Jim McNeil worked to ensure his motorcycle was always functioning properly.  *See* John McNeil Depo. 106:24-107:8.

own motorcycle, helmet, gloves, equipment and maintenance.  SSUF ¶ 12.  For the jump sequence at this event, Defendants placed a motorhome between the takeoff and landing ramps, with a gap between the end of the motorhome and the landing ramp.  SSUF ¶ 14. The distance between the two ramps was 75 feet.  SSUF ¶¶ 15, 47.

Mr. Distler, and freestyle rider and announcer Cory Stem, testified in deposition that it was a rider's decision whether or not to jump.  SSUF ¶ 51.  On November 5, 2011, McNeil made multiple practice jumps before stopping due to wind conditions.  SSUF ¶ 51.[3]  The next day—the day of the incident—Mr. Buyten, Mr. Distler and Mr. Carter made multiple practice jumps.  SSUF ¶¶ 48, 50.

The incident occurred on November 6, 2011 while McNeil was attempting a practice jump.  SSUF ¶ 3.  As he ascended the takeoff ramp, McNeil's motorcycle experienced a malfunction which caused it to "bog," resulting in insufficient power to reach the landing ramp.  SSUF ¶¶ 4, 28, 64.  McNeil's motorcycle first hit the back of the motorhome.[4]  Then he and his motorcycle hit the rear of the landing ramp[5] and fell, coming to rest on top of the tongue of the trailer hitch of the motorhome.  SSUF ¶ 5. McNeil died from his injuries.  SSUF ¶ 5.

McNeil had been riding for Defendants since 2002.  SSUF ¶ 45.  Approximately 75 percent of the freestyle events he participated in after 2005 were promoted by

---

[3] McNeil's father testified that he was not aware that "Jim McNeil jumped the subject FreestyleMX setup at Texas Motor Speedway on November 5."  John McNeil Depo: 163:15-23; *see* SSUF ¶ 60.  It is unclear whether John McNeil believes that Jim McNeil did not jump at all on November 5, or whether he did not jump the same setup on November 5 as he attempted to do on November 6.

[4] The parties fail to mention in their papers that McNeil first hit the back of the motorhome before coming into contact with the landing ramp.  An eyewitness explained: "He landed on the back of the motorhome, and then it just, like, plunged him forward into the back of the safety deck.  And then he fell down, and I didn't see him after that." Buyten Depo. 91:2-5; *see* Stephen Irwin Accident Report, Pls.' Ex. 4.

[5] Dr. Gary Sisler, the medical examiner, testified that McNeil's chin laceration and cervical dislocation could have been caused by his chin striking a blunt force object as he was coming down.  Surreply Ex. 2, Sisler Depo. 66:19-67:9.

Defendants.  SSUF ¶ 58.  McNeil's father believes that McNeil had probably ridden in 250 shows put on by Marc Burnett.  SSUF ¶ 59.  McNeil had performed jumps similar to the one at issue in at least 250 shows.  ¶ 45.  He had performed the motorhome jump sequence at least 100 times.  SSUF ¶ 46.

Mr. Buyten, a fellow rider, testified that after the incident, he told McNeil's family that he thought the normal three-foot gap between the motorhome and the landing ramp was larger than that on the day of the incident.  Buyten Depo. 78:11-18, 79:14-20; 84:9-85:6.  But he also testified that nothing about the setup on November 6 was different from the day before.  Buyten Depo. 116:3-117:24.  Mr. Buyten and Mr. Distler testified that although the gap between the motorhome and the landing ramp would often vary by a foot, the distance had no impact on the safety of the jump sequence.  SSUF ¶ 49.

### C. **The Complaint.**

Plaintiffs filed a wrongful death lawsuit against Defendants, alleging that Defendants should have placed safety airbags on the landing ramp or covered the gap between the motorhome and landing ramp.  SSUF ¶ 6.  They assert that Defendants were reckless due to their failure to equip the landing ramp with necessary protective airbags, and thus rendered the jump setup unsafe and dangerous.  SSUF ¶ 52.  Plaintiffs also complain that the motorhome was not positioned in its customary location on November 6, 2011, and that this incorrect placement created a larger gap between the rear of the motorhome and the rear of the landing ramp.  SSUF ¶¶ 6, 29.  Plaintiffs further alleged that Defendants compelled McNeil to make a practice jump in poor weather conditions.  SSUF ¶ 30.

### D. **FreestyleMX's Exhibition.**

Beginning in 2005, FreestyleMX began to incorporate a motorhome into its jump sequence.  SSUF ¶¶ 13, 19.  The motorhome was placed in between the takeoff and landing ramps, with a gap between the end of the motorhome and the landing ramp.  SSUF ¶ 14.  The distance between the takeoff ramp and the landing ramp is no longer than 75 feet.  SSUF ¶ 15.  Riders, including Plaintiffs' expert, agree that 75 feet from the

end of the takeoff ramp to the "knuckle" of the landing ramp is the "sweet spot" and the preferred jump distance in freestyle motocross.  SSUF ¶ 16.

Defendants contend that prior to Jim McNeil's death, no freestyle motocross riders had failed to make the landing ramp during a jump sequence for a FreestyleMX event. SSUF ¶ 20. Plaintiffs, however, report that at least four riders in non-FreestyleMX events failed to make the landing ramp during a jump sequence.[6]  SSUF ¶ 20.

### E. <u>The Risks Associated with Freestyle Motocross.</u>

Plaintiffs' expert testified that injuries while attempting dangerous stunts are an inherent risk of motocross riding.  Morgan Depo. at 82:10-12; 89:20-23; 233:6-11; 228:24-229:6; 333:13-16.  Ben Houser, McNeil's friend and mechanic, testified that he personally had discussions with McNeil about the risk and danger associated with motocross in light of the deaths of freestyle riders Jeremy Lusk and Jeff Kargola, whom McNeil knew personally.  SSUF ¶ 35.  Jeremy Lusk died during a freestyle motocross event.  SSUF ¶ 42.  Mr. Houser also recalled witnessing McNeil crash after coming up short on a jump at the X Games.  SSUF ¶ 36.

Riders John Distler and Matthew Buyten, who performed jumps at the exhibition on the day of the incident, acknowledged at their depositions the inherent risks of injury associated with freestyle motocross.  Distler Depo. at 56:21-59:20; Buyten Depo. at 15:7-17.  Mr. Distler testified that almost every rider he knows has been injured at some point, and he himself retired because of his own injuries.  SSUF ¶ 38.  Mr. Buyten sustained five broken collar bones, three shoulder surgeries, multiple rib, ankle, and knee injuries, as well as a "handful of concussions."  SSUF ¶ 39.  Vince Morgan, Plaintiffs' expert, broke his hand, kneecap, tibia, and collar bone, and had three concussions.  SSUF ¶ 40.

Before suffering the fatal injuries, McNeil himself sustained a crushed heel, broken hand, face fracture, torn ACL, and a broken femur.  SSUF ¶ 41.

/ / /

---

[6] Defendants object to this evidence as hearsay.

### F. Safety Measures.

The parties agree that the 10-foot safety deck on the landing ramp Defendants utilized conformed to industry standards and was larger than decks other promoters used. SSUF ¶ 62. But they disagree as to whether FreestyleMX ever used airbags in its setups prior to November 6, 2011. *See* SSUF ¶ 57. Defendants say they never used airbags before the incident. In support, they cite Marc Burnett's deposition testimony where he agrees a photograph that included a landing ramp with a new safety deck and airbags depicted a setup devised *after* the incident. Burnett Depo: 33:6-21. Plaintiffs, however, say that FreestyleMX used airbags at least at one event before November 6, 2011. They cite to Stephanie Berkes' deposition, where she says Marc Burnett hosted an event "on a beach with airbags where his motor home was not in the middle of it." Berkes Depo: 159:16-22.

The parties agree that Plaintiffs' expert, Vince Morgan, started using airbags in 2010, when he began producing his own events. SSUF ¶ 55. The same day that he purchased his jump set-up in 2010, he went out and bought an airbag to use with it. SSUF ¶ 55. Mr. Morgan also testified, in response to a question by defense counsel, that it was possible for a rider to injure himself or suffer fatal injuries—regardless of the presence of an airbag—if something "happen[ed] in the air." SSUF ¶ 56.

### II.   DISCUSSION

Defendants move for summary judgment on their defense of primary assumption of the risk. In considering this defense, the court must decide if there is a genuine issue of fact as to whether the failure to provide airbags or the presence of a "larger than normal gap" were extreme departures from the ordinary standard of care.

### A. Legal Standard for Rule 56.

A court may enter summary judgment on factually unsupported claims or on defenses to "secure the just, speedy and inexpensive determination of every action." Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). If the moving party bears the burden of proof, it "has the initial burden of establishing the

absence of a genuine issue of fact on each issue material to its case." *See C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). If the movant meets its burden, the burden shifts to the nonmovant. *See Celotex*, 477 U.S. at 324. The nonmovant must rely on "evidentiary materials" to designate specific facts in opposition to the summary judgment motion. *Id.* (internal quotation marks omitted). These evidentiary materials must show that genuine factual issues remain which "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The nonmovant does not meet this burden by showing "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Here, Defendants bear the burden to show that no genuine issues of material fact exist as to their defense of primary assumption of the risk. If Defendants meet that burden, then none of Plaintiffs' claims survive.

## B. Negligence Claims.

The traditional elements of negligence are duty, breach, causation, and damages. *Jones v. Wells Fargo Bank*, 112 Cal.App.4th 1527, 1541 (2003). To allege gross negligence, a plaintiff must allege these elements and also specifically allege extreme conduct by the defendant. *Eastburn v. Regional Fire Protection Authority*, 31 Cal.4th 1175, 1185-86 (2003). The conduct must rise to the level of "either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.'" *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 751 (2007) (holding that an agreement regarding sports or recreational programs or services that purports to release liability for future gross negligence is generally unenforceable as a matter of public policy).

### 1. Assumption of the Risk as a Defense.

In *Knight v. Jewett*, 3 Cal.4th 296 (1992), the California Supreme Court held that a form of assumption of the risk survived the adoption of comparative fault principles in *Li v. Yellow Cab Co.*, 13 Cal.3d 804 (1975). In *Knight*, the California Supreme Court, in

evaluating a game of touch football, considered the duty of care that should govern the liability of sports participants.  The Court recognized that careless conduct of a sports participant is inherent in many sports and that holding participants liable for such conduct would chill vigorous participation in the sport.  Accordingly, the Court held that those involved in a sporting activity have no legal duty to eliminate risks inherent in the sport itself.  Importantly, however, the *Knight* Court held those involved do have a duty not to increase the risk to a participant over and above those inherent in the sport.  *Knight*, 3 Cal.4th at 316.  In other words, by choosing to participate in the game, co-participants assume that level of risk inherent in the sport.

The duty to not increase an inherent risk does not depend on the particular plaintiff's subjective knowledge or appreciation of the potential risk.  Rather, liability depends on whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against the particular risk of harm.  *Id.* at 316-317.  For operators of sports facilities, the court said, "[a]lthough defendants generally have no legal duty to eliminate (or protect a plaintiff against risks inherent in the sport itself) it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport."  *Id.* at 315-316.  If a defendant breaches that duty, it was negligent.

Here, Defendants argue that McNeil's participation in freestyle motocross—a sport with significant inherent risks—appropriately brings this case under the primary assumption of risk doctrine.  Plaintiffs argue that the doctrine does not apply.  They say that while the nature of freestyle motocross may lend itself to primary assumption of the risk, Defendants' relationship to the sport precludes application of the doctrine.  Instead, they argue that secondary assumption governs this case as it applies to "those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty[.]"  *Knight*, 3 Cal.4th at 308.

/ / /

**2.  Primary Assumption of the Risk.**

Primary assumption of the risk, as an exception to the general duty of care rule, is a defense to negligence.  *Luna v. Vela*, 169 Cal.App.4th 102, 108 (2008).  The question of the scope of a defendant's legal duty is one of law and policy.  *Knight*, 3 Cal.4th at 315, 317; *Shin v. Ahn*, 42 Cal.4th 482 (2007) ("The existence of a duty is not an immutable fact of nature, but rather an expression of policy considerations providing legal protection."); *see Avila v. Citrus Community College Dist.*, 38 Cal.4th 148, 161 (2006).  To answer the question, a court must evaluate: (1) the fundamental nature of the sport; and (2) the defendant's relationship to the sport.  *Id.; Knight*, 3 Cal.4th at 315, 317.  As for policy, a duty should not be imposed where doing so "would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events."  *Kahn v. East Side Union High School Dist.*, 31 Cal.4th 990, 1004 (2003); *Knight*, 3 Cal.4th at 317.  If a court decides that a defendant is relieved of the duty of care, then the plaintiff's negligence action is barred.  *Knight v. Jewett*, 3 Cal.4th 296, 308-309, n.3-4; 315-316 (1992); *Cheong v. Antablin*, 16 Cal.4th 1063, 1068 (1997).

*a.  Fundamental Nature of the Activity.*

Primary assumption of the risk generally applies to an activity that is "done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury."  *Moser v. Ratinoff*, 105 Cal.App.4th 1211, 1221 (2003) (internal quotations omitted) (applying primary assumption of risk doctrine to long distance recreational group bicycle ride); *see Amezcua v. Los Angeles Harley-Davidson*, 200 Cal.App.4th 217, 231-232 (2011) (applying primary assumption of risk doctrine to motorcycle procession).  While this court is not aware of any case that has specifically addressed primary assumption of the risk in the context of freestyle motocross, courts have applied the doctrine to sports considered less risky, such as golf (*see, e.g., Shin*, 42 Cal.4th 482) and volleyball (*see, e.g., Luna*, 169 Cal.App.4th 102).

This case involves the relatively new sport of freestyle motocross, a "young sport" that is not governed by any specific laws, regulations, sanctioning bodies or any written

standards.  Surreply Ex. 3, Homan Depo. 106:21-108:13.  At oral argument, both parties asserted that the fundamental nature of freestyle motocross is "entertainment."  Defense counsel explained there are several forms of freestyle motocross and that the form at issue is "jump-based."  Plaintiffs' counsel explained that the event at issue qualified as entertainment because it was an exhibition rather than a competition: there were no judges, there was no prize money, and the motorhome placed between the two ramps was placed there for marketing purposes, displaying ads for companies.

To better understand the duty owed, the court finds it necessary to define the fundamental nature of the activity more specifically than just "entertainment."  Any professional sport can qualify as "entertainment."  If, for example, an injury arose in a National Football League game, describing that activity as "entertainment"—which it certainly is—gives no context to the injury suffered and would not help determine the scope of a defendant's duty.  Rather, the fundamental nature would be better described in the context of the football game itself and would reference the rules and codes of conduct.  The same must be done here.  To understand the scope of the duty owed by Defendants, one must understand the specifics of the activity and how the injury occurred.

After reviewing the evidence, the court finds that the fundamental nature of this specific type of freestyle motocross is a 75-foot ramp-to-ramp jump done by a rider on a motorcycle where the rider may perform stunts in the air.  SSUF ¶¶ 15, 47; *see* Rebuttal, Ex. O (videos of motocross jumps).  While some event organizers may place objects between the two ramps, there is no evidence that placement of a motorhome or any other object between the ramps is fundamental to the sport.

Freestyle motocross—whether generally described as a sport or as entertainment— involves a challenge with risk of serious injury that is done for "thrills" and requires

physical exertion and skill.[7]  These elements, coupled with the fundamental nature of the activity, render freestyle motocross amenable to application of the primary assumption of risk doctrine.

### b. Defendants' Relationship to the Sport.

Defendants' relationship to freestyle motocross is that of organizer and promoter. SSUF ¶ 43.  They have been promoting freestyle motocross events since 1997.[8]   SSUF ¶ 43.  FreestyleMX promotes over 100 motocross exhibitions annually at major attractions including NASCAR, Daytona 500, CART/IRL, Indianapolis 500 and AMA Superbike events.  SSUF ¶¶ 8, 17.  Each event day typically includes three shows, with four riders performing 15 jumps in a given show.  SSUF ¶ 18.

Mr. Burnett, through FreestyleMX, selects the most experienced and skilled riders with proven track records of success in other internationally acclaimed events such as ESPN's X Games.  SSUF ¶ 11.   FreestyleMX is responsible for all logistics, including providing and erecting the ramps for the riders.  *See* SAC ¶ 12.  The riders are independent contractors.  Rebuttal, Ex. M, Homan Expert Report.  Each of the riders provides his own motorcycle, helmet, gloves, equipment and maintenance.  SSUF ¶ 12.

In light of the evidence submitted, Defendants' relationship to freestyle motocross is akin to that of "owner-operator" as described in other assumption of risk cases.  Based on this relationship Plaintiffs argue that Defendants owed a duty of care to McNeil to organize a reasonably safe event, and through their design and setup of the jumping

---

[7] As Plaintiffs' expert described, "You're depending on a machine to hurl you through the air, and depending on your muscle memory and your state of mind to control those things and, hopefully, put you back on the ground safely."  Morgan Depo. 105:20-23.

[8] Plaintiffs disagree that Defendants served as "promoters" for this particular event. SSUF ¶ 7.  They assert that former co-defendant Sprint was contractually the promoter for the event and that FreestyleMX was contractually prohibited from acting as a "promoter" for it.  SSUF ¶ 7.  In their Second Amended Complaint, Plaintiffs removed any reference to Defendants as "promoters" presumably because "promoters" were expressly recognized as parties covered by the Waiver and Release.

sequence, could have minimized the risks associated with falling short of the jump without altering the sport's nature.  *See, e.g., Branco v. Kearny Moto Park, Inc.*, 37 Cal.App.4th 184 (1995) (holding that the sport of bicycle motocross (BMX) does not inherently require jumps that are designed in a way that creates an extreme risk of injury); *Vine v. Bear Valley Ski Co.*, 118 Cal.App.4th 577 (2004) (holding the appropriate standard of care for the defendant owner-operator was "what steps [it] should reasonably have taken to minimize the risks without altering the nature of the sport").

Defendants counter that as owner-operators they had no affirmative duty to minimize risks that are inherent to the sport.  *See, e.g., Connelly v. Mammoth Mountain Ski Area*, 39 Cal.App.4th 10 (1995) (holding no duty for ski operator to completely pad a metal tower even if it would have cushioned the impact of a skier's collision with that tower); *Ferrari v. Grand Canyon Dories*, 32 Cal.App.4th 248 (1995) (finding no duty for white water rafting operator to pad a metal frame in the raft because the rafts define the nature of the sport and a change in the watercraft would reduce the challenge of the sport).

In sum, the parties disagree on whether Defendants—as owners-operators—have an affirmative duty to minimize the risks inherent to freestyle motocross.  The court further addresses this issue below.

### 3.  Inherent Risks of Freestyle Motocross.

There is a split of opinion as to how to answer the question of whether a particular risk is inherent in a sport.  Some courts say this answer "is necessarily reached from the common knowledge of judges."  *Rosencrans v. Dover Images, Ltd.*, 192 Cal.App.4th 1072, 1083 (2011).  But the California Supreme Court expressly held that expert declarations are admissible to analyze whether a risk is inherent in a sporting activity.  *Kahn v. East Side Union High School Dist.*, 31 Cal.4th 990, 1004 (2003) (finding trial court had no justification to disregard opinion of plaintiff's expert witness when determining legal question of duty).

The parties agree that inherent risks of freestyle motocross include motorcycle

malfunction, coming up short on the jump, and weather conditions.  Surreply, Ex. 1 (Pls.'
Expert Report) and Ex. 4 (Taublieb Depo. 131:1-3); Oral Argument.  They also agree that
in broad terms, inherent risks include crashes, catastrophic injuries and death.  Defs.'
Ps&As, pp.11-13; Morgan Depo. at 82:10-12; 89:20-23; 233:6-11; 228:24-229:6; 333:13-
16.

But Plaintiffs argue that Defendants carry a simplistic view of the inherent risks.
They assert the inherent risks to freestyle motocross also include *any* risks that cannot be
eliminated without altering the fundamental nature of the sport.  *See Knight*, 3 Cal.4th at
317 (noting that some courts define the inherent risks "not only by virtue of the nature of
the sport itself, but also by reference to the steps the sponsoring business entity
reasonably should be obligated to take in order to minimize the risks without altering the
nature of the sport").  Plaintiffs argue that a negligently designed jump, for example,
cannot be one of the inherent risks of freestyle motocross.

The court finds that Defendants' assertion that injury and death are inherent risks
of freestyle motocross is too broad an assertion for the purposes of defining the inherent
risks specific to freestyle motocross.  Injury and death, however remote the possibility,
are risks inherent to any activity.  While catastrophic injuries may be more common in
freestyle motocross than in other activities, courts define the inherent risks specific to the
sport. *See, e.g., Shin*, 42 Cal.4th 452 (inherent risk for golfer is being hit by an errant golf
ball); *Connelly*, 39 Cal.App.4th 10 (inherent risk for skier is crashing into a lift tower);
*Luna*, 169 Cal.App.4th 102 (inherent risk for volleyball player is tripping over the tie
line); *Amezcua*, 200 Cal.App.4th 217 (inherent risk for motorcyclist riding in motorcycle
procession on the freeway was crashing with a vehicle); *Nalwa v. Cedar Fair, L.P.*, 55
Cal.4th 1148, 1154 (2012) (inherent risk in bumper car ride is collision with another car).

Based on the record presented, the court finds that at least two inherent risks
specific to this type of freestyle motocross are the failure to clear the 75-foot jump and
the failure to stick a landing.  Enduring these risks may be due to rider error, motorcycle
malfunction, or weather.  Understanding these specific risks is vital to determining

14

whether Defendants increased an inherent risk in freestyle motocross.  *See Vine*, 118 Cal.App.4th at 593.

Considering the fundamental nature of freestyle motocross and that a risk inherent to the sport—namely, falling short of the 75 foot jump—is a risk that cannot be eliminated without altering the fundamental nature of the activity, the court finds that primary assumption of the risk applies to freestyle motocross. In applying primary assumption of the risk, the court finds that as Jim McNeil raced up the takeoff ramp, he assumed the risk of failure—due to whatever cause—to clear the jump.  But the question remains whether Defendants increased the inherent risk of his catastrophic injury and death by failing to provide airbags or by failing to close the gap between the motorhome and the landing ramp.

### 4.  Whether Defendants Increased the Inherent Risks of the Sport.

As the organizer and promoter of the freestyle motocross event at issue, Defendants had a limited duty of care to McNeil, breached only if they increased the risk beyond that which is inherent to the activity itself.  *Luna*, 169 Cal.App.4th 102; *Shin*, 42 Cal.4th at 498 ("the plaintiff is deemed to have assumed [only] those risks inherent in the sport in which plaintiff chooses to participate").  On a summary judgment motion asserting primary assumption of the risk, a defendant has the burden to show there is no triable issue of fact regarding whether it increased any inherent risks associated with the activity.  *Fazio v. Fairbanks Ranch Country Club*, 233 Cal.App.4th 1053, 1060 (2015).

Plaintiffs argue there is no distinction between increasing the inherent risks of an activity and failing to minimize any associated risks.  They rely on *Vine* and *Branco*, which both held that the owner-operator defendants were under an affirmative duty to minimize the risks associated with a snowboard jump and with a BMX jump.

Defendants counter that the duty to not increase inherent risks and the duty to minimize risks are distinguishable.  They argue that *Vine* and *Branco* are inapplicable because those cases involved overt acts that changed the designs of the subject jumps. There was also a causal connection between the defendants' conduct and the subject

injuries in those cases.  Here, however, there were no overt acts or changes to the design of FreestyleMX's jump, because the lack of airbags and the presence of the motorhome were normal aspects of the jump sequence.  Further, the cause of McNeil's fall was his insufficient speed due to a motorcycle malfunction; in other words, the lack of an airbag did nothing to prevent McNeil from not making the jump.  Accordingly, Defendants argue that *Connelly* is more relevant because there, the plaintiff was injured when his ski binding detached, causing him to crash into a lift tower that was not padded all the way down to the snow.  Even though more padding would have likely cushioned the plaintiff's crash, the court found there was no evidence "that Mammoth increased the inherent risk of colliding with a ski lift tower while skiing. For example, there was no evidence that Mammoth did or failed to do anything that caused Connelly to collide with the tower."  *Connelly*, 39 Cal.App.4th at 12.  Defendants argue the same is true here, that they did nothing to increase the risk that McNeil would actually fall short of the jump.

The court finds that where a defendant is an owner-operator, there is no distinction between the duty to not increase a risk and the duty to minimize risks.  As the *Knight* court observed, the duty of an owner-operator depends not only on defining the risks inherent to the sport but also on "the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport."  3 Cal.4th at 317; *see Morgan v. Fuji Country USA, Inc.*, 34 Cal.App.4th 127, 134 (1995) (finding "the owner of a golf course has an obligation to design a golf course to minimize the risk that players will be hit by golf balls, e.g., by the way the various tees, fairways and greens are aligned or separated").  Defendants' reliance on *Connelly* is understandable.  But given the history and prevalence of skiing, the *Connelly* court could more easily determine that colliding with a lift tower is an inherent risk of skiing such that the owner-operator of the resort had no duty to pad its towers.  39 Cal.App.4th at 14. Here, however, there is not enough historical context to the sport of freestyle motocross and uncontroverted evidence to determine as a matter of law whether the design of the jump (with its motorhome and without airbags) was an inherent risk of the sport.

13cv2703 NLS (KSC)

A trier of fact must evaluate whether a defendant increased the risk to a participant over and above those inherent to the sport, which "requires application of the governing standard of care … to the facts of [the] particular case[.]" *Fazio*, 233 Cal.App.4th at 1062-63.  In this case, the general inquiry is whether avoiding the unprotected bars of the landing ramp or of any other obstacles that are short of the landing ramp pose part of the inherent challenge and risk present in freestyle motocross.  *See, e.g., Knight*, 3 Cal.4th at 315 (noting the example of ski resort having no duty to eliminate moguls because "the challenge and risks posed by the moguls are part of the sport of skiing"); *Ferrari*, 32 Cal.App.4th at 253-254 (noting an inherent risk of white water rafting is "being thrown involuntarily about inside the raft and colliding with objects or people").  Specifically, the question of whether Defendants increased the risks inherent to freestyle motocross turns on whether they owed a duty, in November 2011, to pad the landing ramp with airbags and/or decrease or eliminate the gap between the end of the motorhome and the landing ramp.

Defendants attempt to meet their burden on summary judgment to show that they had no duty to provide protective airbags because they were not in "standard use" in freestyle motocross in November 2011.  To support their position, Defendants cite to the following testimony by freestyle riders and promoters:

- John Distler (freestyle rider):  [Referring back to 2011], "At that time, only a small percentage of people ever used airbags."  Distler Depo. 70:21-71:5.

- Cory Stem (freestyle rider and announcer):  [Q: "And I think you would agree with me that the majority of the people out there doing this use the airbags, right?"] A: "That's not correct.  There's plenty of people out there that aren't using airbags out there."  Stem Depo: 93:17-94:2.

- Justin Homan (freestyle rider and Defendants' expert): "The FreestyleMX setup at Texas Motor Speedway on November 6, 2011 was appropriate and met FMX industry setup standards. I did not identify anything unsafe or outside industry standards with respect to the set up at the time of the incident."  Rebuttal, Ex. M, Expert Report.  Mr. Homan also testified that several other promoters did not use airbags in 2011, and still do not.  Homan

Depo. 52:8-53:23.

- Paul Taublieb (freestyle promoter and Defendants' expert): "Not using an airbag for the November 6, 2011 demo would not be considered unusual or unsafe under industry standards." Rebuttal, Ex. N, Expert Report.

- Video Clips of Ramp to Ramp Demonstrations: Defendants cite to four video clips from before November 2011 that show ramp-to-ramp jumps without airbags. They also cite to the January 2015 world record jump of 125 feet by Jackson Strong that did not use any airbags. Rebuttal, Ex. O.

In contrast, Plaintiffs argue there is at least an issue of fact as to whether airbags were in standard use in November 2011. They cite to the following evidence:

- Matthew Buyten (freestyle rider): [Q: More often than not…[talking about the shows you participate in], is there some type of an airbag setup or covering of a potential gap?] A: "[That happens] more. … majority of the time." Mr. Buyten has done shows with airbags and without airbags; it depends on the promoter. Buyten Depo: 25:7-18; 26:7-27:9; 22:2-9.

- Paul Taublieb (freestyle promoter and Defendants' expert): [Referring to ramp to ramp jumps], "Most of [the] time I used an airbag." From 2005 to 2012, in ramp to ramp jumps in the X games, Taublieb agreed that the majority of those demos used airbags. Taublieb Depo. 91:19-92:2; 56:12-17. While he testified that he thought it was safer to cover the gap, he also testified that with regards to the failure to cover up the gap in November 2011, "it wasn't something people and the riders thought was needed." Surreply Ex. 4, Taublieb Depo. 128:12-129:6; 129:9-23.

- Vince Morgan (freestyle rider and Plaintiffs' expert): Regarding 2015, he testified, "I don't know anyone that does a show without an airbag….or some sort of safety device on the back of the ramp." Mr. Morgan also wrote in his expert report, "To my knowledge, there is not a landing ramp used in a freestyle motocross exhibition show today that does not have an airbag to protect the riders." Morgan Depo. 131:4-132:20. Regarding 2011, Mr. Morgan testified that most promoters used airbags in ramp to ramp jumps. Morgan Depo. 297:9-11; Surreply Ex. 1 (Pls. Export Report), pp.5-6. He also testified that he could not imagine a situation where an airbag would be harmful, as they deflate upon impact. Morgan Depo. 298:10-25.

- Justin Homan (freestyle rider and promoter and Defendants' Expert):  He testified that before November 2011, he put on events in which airbags were used for the riders.  He also testified that he began to use them more after the McNeil incident. In response to the question of why he decided to begin using airbags, he responded, "As the industry standard evolved and changed and talking to my riders. Rider input."  Homan Depo. 57:18-23; 56:24-57:2; 56:21-23; Pls.' Ex. 10 (several photos of Justin Homan using airbags before 2011).  He also testified regarding the safety standards of freestyle motocross that "we want to … minimize the risks as best we can."  Surreply Ex. 3, Homan Depo.:108:8-13.

- Dr. Gary Sisler (medical examiner):  Dr. Sisler testified that had McNeil not struck the wood, metal and steel blunt objects as he was coming down and hit an airbag instead, it probably would have prevented some of the injuries.  Sisler Depo. 68:18-69:2; 69:22-25; Ex. 5 (autopsy report).

The court finds that given all this evidence regarding airbags, there is a question of fact as to whether, in November 2011, airbags were in standard use to protect riders from injuries additional to those they may suffer when they assumed the risk of falling.  There is also a question of fact as to whether the failure to use them was an "extreme departure from the ordinary standard of conduct."  *See Knight*, 3 Cal.4th at 320.  As for the gap between the end of the motorhome and the landing ramp, the court finds there is insufficient evidence to determine whether that gap is a risk inherent to or excessive to the sport.  Whether the arrangement of the jump sequence increased the inherent risks of this type of freestyle motocross is a question of fact for the jury.  *See Fazio*, 233 Cal.App.4th at 1063 (holding whether condition of stage placement posed a substantial risk of injury to a musician was a question of fact).

### 5.  Policy Considerations.

Defendants argue that imposing a duty of care will "chill vigorous participation" in the sport.  Defs.' Ps&As, p.13.  They argue that the "community at large would suffer by the imposition of a special duty of care, since unnecessary precautions above and beyond that of an ordinary prudent event organizer would make events more costly or even prevent events from taking place, creating a chilling effect on the sport at large."  *Id.*  At

oral argument Defendants also said there is less spectator interest in watching jumps with airbags.  Plaintiffs argue there is no evidence that requiring due care in the jump setup would deter vigorous participation in the sport or fundamentally alter its nature.

The court finds insufficient evidence presented to support Defendants' assertion that imposing a limited duty of care for risks additional to the inherent risks would have a chilling effect on the sport at large, including spectators.  While some riders prefer not to use airbags as they create a false sense of security, it is just as possible that airbags and fewer obstacles might encourage more riders to participate in the sport.  Further, Defendants assert that motorcycling generates an estimated $42 billion in revenue annually and is responsible for over 700,000 American jobs.  *See* Defs.' Ex. J.  They also emphasize that over 160,000 spectators attended the X Games in 2014, the flagship competition for freestyle motocross.  Defs. Mem.Ps&As, p.14; Ex. I.  The policy concerns that Defendants voice—namely higher ticket prices for spectators and increased costs for a promoter—do not sound like valid policy considerations that merit a sacrifice on safety measures, *if* there is evidence that those measures could increase the safety of the sport without altering its fundamental nature.  *See Matsushita*, 475 U.S. at 586 (nonmovant must show more than "some metaphysical doubt as to material facts").

Finally, freestyle motocross is a relatively new and creative sport and, unlike golf, football or skiing, there is no historical context for determining what standards, especially safety standards, should be used.  Even Defendants' expert, Justin Homan, testified that freestyle motocross is a "young sport" and is not governed by any specific laws, regulations, sanctioning bodies or any written standards.  Surreply Ex. 3, Homan Depo. 106:21-108:13.  He believes that as the sport evolves and grows, "there are things that, over time…especially if they can be quantified and proven…they're a standard that should be taken … [to] minimize the risks as best we can."  Surreply Ex. 3, Homan Depo. 108:8-13.  With the ever-increasing popularity and creativity of the X Games and other extreme sports, and the lack of sufficient historical information that would be available in other sport contexts to help determine whether certain acts increase the risks inherent in

freestyle motocross, it would be premature for this court to find that, as a matter of law, Defendants had no duty to provide a potential safety feature (airbags or an eliminated gap) to protect riders who may fall short of a jump.

### C. Secondary Assumption of Risk / Comparative Fault.

"The primary assumption of risk doctrine articulates what kind of *duty* is owed and to whom." *Shin*, 42 Cal.4th at 499 (emphasis in original). The doctrine limits a duty the defendant owes. *Id.* If the defendant breaches that duty, the case moves on to a secondary assumption of risk analysis that considers the plaintiff's comparative fault:

> [I]n certain circumstances primary and secondary assumption of risk are intertwined and instruction is required so the jury can properly determine whether the defendant did, in fact, increase the risks inherent in a hazardous sport so that secondary assumption of the risk should be considered.
> ***
> Cases like this one, where the plaintiff contends the defendant breached the duty not to increase the risks inherent in a hazardous sporting activity, present both aspects of the assumption of risk doctrine. If the plaintiff fails to show any increase in the inherent risks, or if the trial court determines that the only risks encountered were inherent in the sport, the defendant prevails based on primary assumption of risk. If the jury, properly instructed on the scope of the defendant's duty, determines the defendant did increase the inherent risk, it then considers the plaintiff's claim based on secondary assumption of risk as an aspect of the plaintiff's comparative fault.

*Vine*, 118 Cal.App.4th at 592, 593.

In a secondary assumption of risk case, assumption of the risk "is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties. *Knight*, 3 Cal.4th at 315. Here, if the trier of fact finds that Defendants increased the inherent risks of freestyle motocross due to the design of the jump, the case would merge into secondary assumption of risk to account for McNeil's comparative fault and determine damages.

/ / /

### D. Firefighter Rule.

Defendants alternatively argue that Plaintiffs' claims are barred by the "firefighter rule," a recognized application of primary assumption of the risk.  The rule says that when employees "are *injured by the very hazard they have been employed to confront*, they are generally precluded from recovering in tort damages from private persons."  *City of Oceanside v. Superior Court*, 81 Cal.App.4th 269, 275 (2000) (emphasis in original).  Because this court finds that primary assumption of the risk applies to this case, it need not address the "firefighter rule."

### E. Punitive Damages.

#### 1. Evidence to Support Punitive Damages.

Defendants argue that Plaintiffs presented no evidence that Defendants acted in conscious disregard for the rights and safety of others.  Plaintiffs ask for an opportunity to present the evidence at trial.

"Where, as here, a plaintiff seeks to impose liability based on negligent conduct, such plaintiff can establish 'malice,' for purposes of punitive damages, by submitting evidence that the defendant acted with a 'conscious disregard of the safety of others.'" *Snyder v. Enterprise Rent-A-Car Co. of San Francisco (ERAC-SF)*, 392 F.Supp.2d 1116, 1129 (N.D. Cal. 2005).  Here, the court finds that genuine issues of material fact exist as to whether Defendants increased the inherent risks of freestyle motocross, which could support a finding of gross negligence.  Facts supporting a finding of gross negligence could likewise support a jury finding for punitive damages.  *Id.*

Due to the lingering questions of fact, the court **DENIES without prejudice** Defendants' summary adjudication request as to punitive damages.  If this case proceeds to trial, Defendants may file a Rule 50(a) motion for directed verdict as to punitive damages at the conclusion of Plaintiffs' case.

#### 2. Standing for Sharell and John McNeil as to Punitive Damages.

The right to recover punitive damages on behalf of a decedent belongs solely to the decedent's representative in a survivor action, and not to the heirs.  *See Doak v. Superior*

*Court for Los Angeles County*, 257 Cal.App.2d 825 (1968) ("exemplary or punitive damages are not recoverable in an action for wrongful death, whether the death was caused by the negligence of the defendant or by his wanton and willful misconduct"). Here, Stephanie Berkes is McNeil's representative in the survivor aspect of this action and can litigate causes of action that accrued prior to McNeil's death, including claims for punitive damages. *See* Cal. Civ. Proc. § 377.30. John and Sharell McNeil, as heirs, bring a distinct wrongful death claim based on loss of love, companionship and services McNeil would have provided but for his death, and thus cannot recover punitive damages. *See* Cal. Civ. Proc. § 377.60; *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 450 (1976). Accordingly, John and Sharell McNeil have no standing to claim punitive damages.

## III.   <u>REQUEST FOR JUDICIAL NOTICE</u>

Defendants filed a request for judicial notice of the Second Amended Complaint ("SAC") filed in this court on April 8, 2015. Dkt. No. 46.[9] Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Additionally, a "court shall take judicial notice if requested by a party and supplied with the necessary information." Fed R. Evid. 201(c). Judicial notice, however, is inappropriate where the facts to be noticed are irrelevant. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998); *Turnacliff v. Westly*, 546 F.3d 1113, 1120 n.4 (9th Cir. 2008).

Having been filed with this court, the existence of the SAC is capable of accurate

---

[9] Defendants ask this court to take notice of the SAC filed on March 2, 2015. On March 2, Plaintiffs filed a motion for leave to file the SAC. Defendants opposed the motion. This court issued an order on April 6, 2015 granting Plaintiffs leave to file the SAC. Plaintiffs then filed the SAC on April 10, 2015. The document filed on April 10 is the same one that Defendants attach to their request for judicial notice.

1   and ready determination.  Fed. R. Evid. 201(b).  Accordingly, the request for judicial

2   notice of the SAC is granted as to the existence of the document and fact that it comprises

3   a filed document in this case.

4         **IV.**   **OBJECTIONS TO SUBMITTED EVIDENCE**

5        Defendants object to this submitted evidence: (1) lines 32:22-33:12 of the first

6   deposition of Mark Burnett; (2) Exhibit 7 to the first deposition of Mark Burnett; and (3)

7   Vince Morgan's Expert Report.

8        Defendants object that the evidence associated with Mark Burnett's deposition is

9   evidence of subsequent remedial measures.  The court overrules these objections without

10   prejudice.  First, Defendants themselves cite to some of this same evidence in support of

11   their position.  In SSUF ¶ 57, they cite to lines 33:6-21 of the first deposition of Mark

12   Burnett to make the point that FreestyleMX did not use airbags in its setups before

13   November 6, 2011.  They cite to this evidence to refute the testimony of Stephanie

14   Berkes on that point.  Second, the court did not consider any of FreestyleMX's

15   subsequent remedial measures in determining this motion for summary judgment.

16        Regarding Vince Morgan's Expert Report, Defendants object to it based on the

17   factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

18   The court overrules this objection without prejudice to refiling it as a motion in limine, to

19   be filed in accordance with the court's February 5, 2016 Order Resetting Pretrial and

20   Trial Dates, and which orders the parties to first meet and confer on the issue.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

## V.  <u>CONCLUSION</u>

2

Defendants have not met their burden on summary judgment to show that no

3

genuine material fact exists as to whether they increased the risks inherent to freestyle

4

motocross.  The court therefore **DENIES** their motion for summary judgment.

5

**IT IS SO ORDERED.**

6

Dated:  April 8, 2016

7

8

Hon. Nita L. Stormes
United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13cv2703 NLS (KSC)